UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEANNINE CLARK,

          Plaintiff,

    v.

AMTRUST NORTH AMERICA, et al.,

          Defendants.

Case No.  16-cv-05561-MEJ

**ORDER RE: MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 42

## INTRODUCTION

Defendants AmTrust E&S Insurance Services, Inc.; AmTrust North America, Inc.; AmTrust Financial Services, Inc.; and Tony Weddle move for summary judgment on each of Plaintiff Jeannine Clark's claims. Mot., Dkt. No. 42; Mem. P. & A., Dkt. No. 42-1.[1] Plaintiff filed an Opposition (Dkt. No. 43) and Defendants filed a Reply (Dkt. No. 45). The Court previously found this Motion suitable for disposition without oral argument. Dkt. No. 47; *see* Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b). Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** Defendants' Motion for the following reasons.

## MATERIAL FACTS

Unless otherwise noted, the following material facts are undisputed.

### A.    Plaintiff's Pre-Maternity Leave Work

In May 2010, Plaintiff began working for Naxos Avondale Specialty Casualty Inc. as an

---

[1] Defendants separately filed their Notice of Motion (Dkt. No. 42) and Memorandum of Points and Authorities (Dkt. No. 42-1). For purposes of this Order, citations to the Motion refer to Docket No. 42-1.

1    Assistant Underwriter in Select Business. Askanas Decl., Ex. B ("Clark Dep.") at 27:8 & 28:17,

2    Dkt. No. 42-3; Clark Decl. ¶¶ 3, 7, Dkt. No. 43-1. AmTrust E&S purchased Naxos in November

3    2010. Clark Dep. at 27:4; Clark Decl. ¶ 4; Lewis Decl. ¶ 2, Dkt. No. 42-7. Weddle, AmTrust

4    E&S' Assistant Vice President, was Plaintiff's direct supervisor at AmTrust E&S. Clark Dep. at

5    33:11-17; Clark Decl. ¶ 5; Weddle Decl. ¶ 1, Dkt. No. 42-8. Weddle worked in the San Fernando

6    Valley region of Los Angeles and oversaw a team of Underwriters at AmTrust E&S' San

7    Francisco office, where Plaintiff worked. Clark Dep. at 33:23-25, 34:4-7; Clark Decl. ¶ 5. At

8    some point, Plaintiff became an Underwriter. Clark Dep. at 28:18-24; Clark Decl. ¶ 6; *see* Clark

9    Dep. at 58:18-19 ("Eventually I started to underwrite, and I believe that was in March.").

10       In February 2014, Plaintiff notified Defendants that she would be taking maternity leave.

11    Clark Decl. ¶ 10. She filed a request with Defendants' insurance provider for leave under the

12    California Family Rights Act ("CFRA") and the Family Medical Leave Act ("FMLA"), which

13    was approved. *Id.*

14       Prior to taking maternity leave, Plaintiff had a book of business in the construction industry

15    based on direct submissions from brokers. *Id.* ¶ 29; *see* Clark Dep. at 107:25-108:2 ("A book of

16    business generally denotes those clients someone has control over from whom they generate

17    compensation").

18    **B.**     **Plaintiff's Maternity Leave**

19       Plaintiff's maternity leave began on June 24, 2014. Clark Decl. ¶ 11; Clark Dep. at 57:17-

20    24, 85:15-17. On November 20, 2014, Chona Boretti of AmTrust's Human Resources sent

21    Plaintiff an email with the subject "Leave of Absence Status" stating

22         We've been informed by UNUM[2] that your FMLA [leave] was

23         exhausted and that your California protected CFRA [leave] was
approved through 11.30.14. Your supervisor, Tony Weddle has also

24         informed us that he has tried reaching out to you as well but has not
heard back from you regarding your plans to return to work.

25         Please let us know if you intend to return to work on Monday,

26         December 1, 2014. Your immediate response is greatly appreciated.

27

28    [2] UNUM is AmTrust's external vendor, which administers and tracks AmTrust employees' leaves
of absence. Clark Decl., Ex. 1 at ECF p.7.

Clark Decl., Ex. 1 at ECF pp. 2, 4, 6, 8. On November 24, 2014, Plaintiff responded that "I have attached a letter received from UNUM approving my CFRA [leave] through December 24, 2014. I was unaware that Tony was trying to reach me. I will reach out to him today and discuss my return date." *Id.* at ECF p.2; *see also id.* at ECF p.3 (November 24, 2014 email from Plaintiff to Weddle).

At 12:00 p.m. on December 10, 2014, Plaintiff sent Boretti a follow up email regarding her leave of absence, stating that

> [m]y pregnancy disability leave began on June 23, 2014. My pregnancy disability leave lasted all four months, through October 23, 2014.

> At that time, I began my full 12 weeks of job-protected CFRA leave, due to a continuing, pregnancy related medical condition. If I recover before the full 12 weeks have expired, I would like to use my remaining CFRA leave time to bond with my baby. These 12 weeks will extend through January 15, 2015.

*Id.* at ECF pp. 5, 7. Boretti responded at 2:10 p.m. that same day that

> we understand that letters were sent to you previously from UNUM indicating time which would be exhausted for FMLA, CFRA; including the Pregnancy Leave Disability.

> We have forwarded your email to UNUM to provide their response and reasons they have provided us with the exhausted dates which I also understand you received.

> Furthermore, we were also informed that you have applied for Long Term Disability and this is pending UNUM's review.

*Id.* at ECF p. 7.

## C. Plaintiff's Return from Maternity Leave

Plaintiff returned to work on January 20, 2015. Clark Decl. ¶ 11; Clark Dep. at 57:23-24, 85:18-19. Plaintiff declares that although Weddle "was pestering [her] to return back to work early[,]" she "delayed [her] return to work to January 20 at the specific request of Tony Weddle." Clark Decl. ¶¶ 20-21.

Plaintiff met with Weddle upon her return to work on January 20, 2015. *Id.* ¶ 15. Plaintiff declares Weddle informed her that the position Plaintiff held prior to her maternity leave was no longer available to her; Plaintiff's book of business had been reassigned; Plaintiff's new position

would entail administrative duties; and Plaintiff's book of business and previous position would have been available to her had she returned to work prior to her scheduled return date. Clark Decl. ¶¶ 15, 19. It is undisputed that at least some of Plaintiff's brokers had been reassigned to Regina Molloy. *Id.*; Clark Dep. at 115:9-10; Mot. at 6. Plaintiff describes Molloy as "far less experienced" than Plaintiff (Clark Decl. ¶ 15) and attributes the reassignments to favoritism due to Weddle and Molloy's rumored affair (Clark Dep. at 115:11-116:4).[3]

Plaintiff contends she performed administrative tasks for the first two weeks upon her return to work. Clark Decl. ¶ 16; *id.*, Ex. 3 ("During the first two weeks from your return to work date, you have been assigned temporary projects to complete."). Defendants describe this as temporary work on audits and training on AmTrust's new online system, which AmTrust had implemented during Plaintiff's maternity leave. Clark Dep. at 132:6-133:4.

Thereafter, Plaintiff was tasked with "attempting to obtain new business from a limited number of seriously underperforming accounts," which she characterizes as a "new position" that "was a demotion with less responsibility, a different book of business, and less possibility for future growth and merit-based bonuses." Clark Decl. ¶ 16; *see* Weddle Decl., Ex. B at ECF p.9 ("When returning from maternity leave in January I was working on clerical duties and I was not assigned any brokers until February 2nd."). Plaintiff describes her three assigned clients as the "most underperforming accounts on Tony Weddle's entire broker list"; for instance, one broker annually wrote less than $1,000 in premiums. Clark Decl. ¶ 18. Nevertheless, Weddle told Plaintiff that her future compensation depended on securing quotas from these clients that were far in excess of past business done with these clients. *Id.* Plaintiff's other accounts, primarily Crouse, were transferred to Molloy. *Id.* ¶ 17; *id.*, Ex. 3 ("While on leave it was determined Crouse & Associates would be reassigned to another Select Business Underwriter, Regina Molloy."). As a result of these reassignments, Plaintiff contends she was forced to develop a book of business in

---

[3] Defendants assert that "the rumor was started by Plaintiff based solely upon speculation." Mot. at 6. The Motion cites no evidence to support this assertion; in fact, this is contradicted by Plaintiff's testimony. Clark Dep. 115:19-21 ("Q. It was rumored by who? Who started the rumor [that Molloy and Weddle had a relationship], do you know? A. I don't know. Q. Did you start the rumor? A. No.").

manufacturing, wholesale, distribution, restaurants, hotels, and liquor liability, which are "disparately different industries than the construction industry" which Plaintiff serviced during her career at AmTrust. *Id.* ¶ 23; *see id.* ¶ 29 ("After I returned from maternity leave, I was assigned to work on completely new risks for which I had no formal training. . . .").

According to Defendants, while Plaintiff was on maternity leave, AmTrust E&S reallocated employee resources across broker assignments to tackle growth opportunities and bring the division close to the 2015 business plan. Lewis Decl. ¶ 6. This reallocation sought to reduce and redistribute broker assignments across the group to provide Underwriters with more time to develop relationships and cultivate business. *Id.* As a result, each of the employees in the Select Business section, including Plaintiff, experienced a reassignment of brokers. *Id.* ¶ 7; Weddle Decl. ¶ 4. To account for the realignment, Weddle substantially lowered Plaintiff's premium goals. Clark Dep. at 95:7-13. Defendants also describe efforts to familiarize Plaintiff with her new accounts and train Plaintiff on the new online system, including introducing her to other underwriters with experience with the system and conducting one-on-one trainings with her. *Id.* at 142:14-21, 143:13-19, 153:4-9.

**D.     AmTrust's Internal Response**

Plaintiff repeatedly raised her concerns about her position with Weddle and Boretti. On January 21, 2015, Plaintiff met with Weddle and expressed her belief that she was being demoted as a direct result of her maternity leave. Clark Decl. ¶ 25; *see id.*, Ex. 4 (Jan. 22, 2015 email from Weddle to Boretti acknowledging meeting). Plaintiff represents Weddle "refused to change his decision" and referred her to HR. *Id.* ¶ 25.

In a January 23, 2015 email to Boretti, Plaintiff raised her concern that she was being demoted. Clark Decl. ¶ 26 & Ex. 2. Boretti responded that Plaintiff "returned from work to the same position title, Underwriter, and the same salary which you were making prior to your leave of absence." *Id.* ¶ 27.

On January 30, 2015, Plaintiff received a memorandum from Weddle regarding her return to work. *Id.* ¶ 28 & Ex. 3. The memorandum explains that "between 06/24/2014 to 01/20/2015 AmTrust E&S experienced significant growth which required individual departments to be created

within the division." *Id.*, Ex. 3 at 1. It also states that Plaintiff's "position falls within the Select Business department" and outlines "an informative and comprehensive plan as it relates to [her] position and job duties effective 1.20.2015[.]" *Id.* The memorandum sets forth Plaintiff's individual performance goals, including production objectives and targets. *Id.* at 4.

**E.      Plaintiff's Performance**

After she returned to work, Plaintiff was required to only use AmTrust's online underwriting program for her new clients. Clark Decl. ¶ 30. Plaintiff struggled to meet her target goals. For instance, Plaintiff's initial quota was to receive at least 25 quotes online per broker each month; however, she "was lucky if she received 2 quotes in a month." *Id.* At the close of the second quarter of 2015, Plaintiff had only written 21% of her annual goal in premium revenues. Weddle Decl. ¶ 9. Plaintiff attributes these deficiencies in part to problems with AmTrust's online system. Clark Decl. ¶ 30.

On April 20, 2015, Plaintiff met with Weddle to discuss her performance. *Id.* ¶ 31; Weddle Decl. ¶ 6. Plaintiff emphasized to Weddle that his expectations were unrealistic in light of her assigned, historically underperforming brokers; that he treated her differently from other employees; and that his action plan set her up for failure. Clark Decl. ¶ 31; *see id.*, Ex. 10 (April 20, 2015 email from Weddle to Plaintiff summarizing action plan for the second quarter 2015); Weddle Decl. ¶ 6 ("We discussed the challenges she faced with individual accounts, the issues she faced with her brokers, and if she had made any time to visit with these clients."). Weddle also reviewed marketing ideas and instructed Plaintiff to participate in group discussions and be receptive to help from other team members. Weddle Decl. ¶ 6.

On May 14, 2015, Weddle gave Plaintiff an overall evaluation rating of "2 – Needs Improvement" on her 2014-2015 Performance Review. *Id.* ¶ 7 & Ex. B; Clark Decl. ¶ 41. Weddle explains this rating was due to "Plaintiff's chronic tardiness and failure to meet production goals for three months in a row." Weddle Decl. ¶ 7.

On August 20, 2015, Weddle performed a random monthly audit which revealed Plaintiff approved a premium for a broker who had a prior loss over $50,000 which required management approval. *Id.* ¶ 11. Plaintiff had not sought or obtained approval. *Id.* Weddle verbally counseled

Plaintiff for a serious underwriting authority violation and sent a follow up email on August 24, 2015. *Id.* ¶ 11 & Ex. C.

**F.      Plaintiff's Termination**

On September 3, 2015, AmTrust placed Plaintiff on a Final Written Warning. *Id.* ¶ 12 & Ex. D. The Final Written Warning was due to Plaintiff's work performance, three authority violations, and attendance concerns. *Id.*, Ex. D at 1. It also outlined Plaintiff's department goals from February through August 2015 and what she had achieved. *Id.* As of the date of the Final Written Warning, Plaintiff had written 30% of her annual target. *Id.* ¶ 12; *see id.*, Ex. D at ECF p.19 ("Jeannine currently stands at 30% year-to-date budget for February-August 2015."). The Final Written Warning included a performance improvement plan which outlined four actions for Plaintiff, including visiting clients at least once per quarter; meeting premium writings of $225,000 in September 2015; working within her Underwriting Authority Letter; and not calling off work. *Id.*, Ex. D at ECF p.21. The Final Written Warning also stated that "termination[] may result if you fail to correct the noted behavior or perform these or other job responsibilities in a satisfactory manner." *Id.*

Plaintiff challenged the Final Written Warning as retaliatory. *Id.* ¶ 13. Human Resources removed one of Plaintiff's authority violations due to inconsistent directives from management. *Id.* ¶ 13 & Ex. E. Plaintiff's improvement plan remained the same. *Compare id.*, Ex. D *with id.*, Ex. E.

Plaintiff called off work on September 22, 2015. *Id.* ¶ 14. As of that date, Plaintiff wrote 12% of her September 2015 target, and her premium written year-to-date was 30% of her target. *Id.* ¶ 14. Defendants fired Plaintiff on September 28, 2015. *Id.* ¶ 14 & Ex. F; Clark Decl. ¶ 43. Plaintiff's Involuntary Separation Notification described Plaintiff's failures to meet premium goals, including her "fail[ure] to achieve [her] September 2015 premium goal of $225,000" and "[w]ith only one week left in the month, [she is] only 12% to plan for the month of September." Weddle Decl., Ex. F at ECF p.27. As to her annual premium budget, Plaintiff was "only 30% [of her $975,000] to plan year-to-date and we are entering October." *Id.* at ECF p.27. The Notification also described problems with Plaintiff's attendance, such as the fact that she exceeded

her sick time for 2015 and called out of work on September 22, 2015, despite the Final Written Warning's admonishment that such conduct would result in further disciplinary action. *Id.* at ECF p.28. Finally, the Notification described two brokers' requests to have their business reassigned to other Underwriters. *Id.*

**PROCEDURAL HISTORY**

Plaintiff filed complaints with the Department of Fair Employment and Housing ("DFEH") and the Equal Employment and Opportunity Commission ("EEOC"). Clark Decl. ¶ 45.

Plaintiff's July 27, 2015 DFEH complaint states she "was subjected to Discrimination, Retaliation by respondent, AmTrust [E&S] Insurance Services" and "was Demoted, Denied reinstatement, other." Askanas Decl., Ex. A (DFEH Compl.) at ECF p.7, Dkt. No. 42-2. Plaintiff states "I believe I have been demoted and denied reinstatement to my regular position due to my Sex-Pregnancy and taking FMLA." *Id.* She describes how "her portfolio of clients had been taken away and given to another employee, Regina Malloy[,] in Retaliation for me taking the leave" and how she was placed on administrative duties. *Id.* Plaintiff also states she "received a negative annual review in retaliation for taking my leave from my supervisor Tony Weddle[.]" *Id.*

On July 2, 2016, Plaintiff received a right-to-sue notice from the DFEH. Clark Decl. ¶ 45 & Ex. 23. She received right-to-sue notices from the EEOC on September 6, 2016. *Id.* (both). Plaintiff initiated this action on September 29, 2016. *See* Compl., Dkt. No. 1. She filed the operative Second Amended Complaint ("SAC") on July 12, 2017. SAC, Dkt. No. 38. Plaintiff asserts seven claims: (1) violation of Title VII, 42 U.S.C. § 2000e-2; (2) violation of the FMLA; (3) violation of CFRA; (4) violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a); (5) retaliation in violation of California Government Code section 12940(h); (6) failure to prevent discrimination or retaliation in violation of California Government Code section 12940(k); and (7) wrongful termination in violation of public policy. *Id.* ¶¶ 53-102. Plaintiff alleges her first, fourth, fifth, sixth, and seventh claims against AmTrust North America, AmTrust E&S, and AmTrust Financial Services (collectively, the "AmTrust Defendants"). Her second and third claims are against Weddle and the AmTrust Defendants. Defendants move for summary judgment on each claim.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (internal quotations omitted).

Additionally, at the summary judgment stage, parties must set out facts they will be able to prove at trial. At this stage, courts "do not focus on the admissibility of the evidence's form . . . . [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citation omitted). "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citations omitted). Accordingly, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

## EVIDENTIARY OBJECTIONS

Both parties assert a number of evidentiary objections.[4] The Court addresses each in turn.

**A.      Plaintiff's Objections**

Plaintiff objects to Exhibit B of the Askanas Declaration and several paragraphs of the Lewis and Weddle Declarations. *See* Opp'n at 3-5.

1.      Exhibit B to the Askanas Declaration

Exhibit B to the Askanas Declaration includes portions of Plaintiff's deposition transcript. Plaintiff objects that Defendants did not attach the exhibits referenced therein. *Id.* at 3. Defendants include these exhibits in Reply. Suppl. Askanas Decl., Ex. A, Dkt. No. 45-2. Plaintiff did not object to this submission. *See* Docket; Civ. L.R. 7-3(d)(1) (requiring objections to reply evidence to be filed within seven days after reply is filed). Accordingly, the Court OVERRULES

---

[4] "Instead of challenging the admissibility of . . . evidence, lawyers should challenge its sufficiency because a court can award summary judgment only when there is no genuine dispute of material fact." *Dillon v. Cont'l Cas. Co.*, 2017 WL 4355070, at *2 (N.D. Cal. Sept. 29, 2017) (internal quotation marks and edits omitted).

Plaintiff's objections to Exhibit B.

### 2. Lewis Declaration

Plaintiff objects to paragraphs 6, 7, and 8, and the second sentence of paragraph 9 of the Lewis Declaration as hearsay. Opp'n at 3-4. The Court OVERRULES these objections, as these statements do not constitute hearsay.

Plaintiff's objection to paragraph 8 and Exhibit E as irrelevant is OVERRULED. *See Dillon*, 2017 WL 4355070, at *2 ("'[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself'" and are superfluous. (citing *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).

Plaintiff's objections to paragraphs 7 and 8, Exhibits D and E, and the second sentence of paragraph 9 as lacking foundation are OVERRULED. In Reply, Lewis explains the basis for the knowledge set forth in his Declaration. *See* Suppl. Lewis Decl., Dkt. No. 45-1. Plaintiff did not object to the Supplemental Lewis Declaration. *See* Docket; Civ. L.R. 7-3(d)(1).

As the Court does not rely on paragraph 3 or Exhibit A of the Lewis Declaration in this Order, the Court finds Plaintiff's objections thereto MOOT.

### 3. Weddle Declaration

The Court OVERRULES Plaintiff's objections to paragraph 4, 5, 8, 11, 12, 13 and 14. Defendants can present this information in an admissible form at trial. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." (citing Fed. R. Civ. P. 56(e)).

## B. Defendants' Objections

The Court finds Defendants' objections to paragraphs 3, 4, 6, 7, 16, 20, 27, 28, 29, 31, 40, and 44 of the Clark Declaration as MOOT as the Court does not rely on these statements in this Order. The Court OVERRULES Defendants' objections to paragraph 46 and Exhibit 24 of the Clark Declaration based on relevancy. *See Dillon*, 2017 WL 4355070, at *2.

**DISCUSSION**

**A.      Exhaustion of Title VII, FEHA, and CFRA Claims**

California's FEHA prohibits an employer from discriminating on the basis of "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status." Cal. Gov't Code § 12940(a). Title VII of the Federal Civil Rights Act of 1964 is the federal counterpart to FEHA. *Rodriguez v. Airborne Express*, 265 F.3d 890, 896 n.4 (9th Cir. 2001) (citing 42 U.S.C. § 2000e). Courts may therefore "look to federal authority regarding Title VII and similar civil rights statutes when interpreting analogous statutory provisions of FEHA." *Id.*

1.      Legal Standards

"Title VII . . . sets out a detailed, multi-step procedure through which the [EEOC] enforces the statute's prohibition on employment discrimination." *Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1649 (2015). "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002), *as amended* (Feb. 20, 2002) (internal quotation marks and brackets omitted). Title VII requires a complainant to "first file a charge with the EEOC within 180 days of the alleged unlawful employment practice, or, if . . . the person initially instituted proceedings with the state or local administrative agency, within 300 days of the alleged unlawful employment practice." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008) (citing 42 U.S.C. § 2000e-5(e)(1)). "If the Commission finds no 'reasonable cause' to think that the allegation has merit, it dismisses the charge and notifies the parties." *Mach Mining*, 135 S. Ct. at 1649. Along with the notice, the complainant receives a right-to-sue letter. *Surrell*, 518 F.3d at 1104. "Once a person receives an EEOC right-to-sue letter, she has 90 days to file suit." *Id.* (citing 42 U.S.C. § 2000e-5(f)(1)).

Exhaustion under FEHA "requires filing a written charge with DFEH within one year of the alleged unlawful employment discrimination, and obtaining notice from DFEH of the right to sue." *Rodriguez v. Airborne Express*, 265 F.3d 890, 896 (9th Cir. 2001). Upon receiving a right-

to-sue letter from the DFEH, a plaintiff has one year to file her FEHA claim in a judicial forum. Cal. Gov't Code § 12965(b). Where Title VII and FEHA claims overlap, the EEOC and DFEH are each the agent of the other for purposes of receiving charges, and a filing with one agency is therefore considered to be constructively filed with the other. *See EEOC v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000); *Paige v. California*, 102 F.3d 1035, 1041 (9th Cir. 1996) ("[T]he filing of a charge with one agency is deemed to be a filing with both.").

"The exhaustion requirement applies to CFRA claims as well as FEHA claims. Because the CFRA is part of the FEHA, before bringing a cause of action under the CFRA, the employee must exhaust administrative remedies provided by FEHA by filing an administrative complaint with the DFEH, and obtaining a notice of right to sue." *Simon v. Health Net of Cal., Inc.*, 2013 WL 5676044, at *2 n.3 (Cal. Ct. App. Oct. 18, 2013); *Bere v. MGA Healthcare Staffing Inc.*, 2016 WL 3078871, at *2 (N.D. Cal. June 1, 2016) ("Because CFRA is a part of FEHA, a plaintiff must also exhaust administrative remedies before bringing a civil action for violation of CFRA.").

            2.    <u>Analysis</u>

Defendants argue Plaintiff failed to exhaust her administrative remedies as to any unlawful termination claims under Title VII or FEHA, as well as her CFRA claim. Mot. at 11-13, 19-20. Defendants contend that because Plaintiff filed her EEOC charge on July 27, 2015, approximately two months before her discharge, that charge cannot include any claim of unlawful termination. *Id.* at 11-12. Defendants further argue Plaintiff cannot relate her unlawful termination claim to her charge of discriminatory or retaliatory demotion. *Id.* at 12-13.

                  a.    *Waiver*

As an initial matter, the fact that Defendants did not raise the issue of exhaustion in its Answer does not preclude it from arguing it now. *See* Opp'n at 17 (arguing "[a] defendant must timely present the affirmative defense of whether a FEHA plaintiff has properly presented all claims to the DFEH"); Answer, Dkt. No. 41. Plaintiff contends "'a defendant waives the defense [of exhaustion] by failing to timely assert it.'" Opp'n at 17 (quoting *Mokler v. County of Orange*, 157 Cal. App. 4th 121, 135 (2007)). *Mokler* is inapposite. In *Mokler*, the defendant argued for the first time on appeal that the plaintiff failed to exhaust her administrative remedies for her claim of

retaliatory termination under California Labor Code section 1102.5. 157 Cal. App. 4th at 113. The California Court of Appeal held that "[b]y failing to raise the [exhaustion] issue before trial, the [defendant] implicitly consented to the trial court's jurisdiction over [the plaintiff's] retaliatory termination claim." *Id.* at 136.

The *Mokler* Court did not hold a defendant had to raise the issue of exhaustion in its answer; it held only that a defendant must do so prior to trial and not for the first time on appeal. *See id.*; *id.* at 127 ("We conclude the County waived its exhaustion defense by failing to raise it *before trial*." (emphasis added)); *id.* at 134 ("[Defendant] relies on . . . *Abelleira v. District Court of Appeal* (1941) 17 Cal. 2d 280, 293 . . . , which declared the exhaustion of administrative remedies to be jurisdictional. This does not mean, however, a party may raise the issue for the first time on appeal."). There has been no trial in this case, nor is the case on appeal. Plaintiff offers no other reason to find *Mokler* applies to the case at hand.

*Keiffer v. Bechtel Corp.*, 65 Cal. App. 4th 893 (1998), is equally unavailing. *See* Opp'n at 17 (citing without analyzing *Keiffer*, 65 Cal. App. 4th at 896-99). The *Keiffer* defendant argued for the first time in its appellate reply brief that the plaintiff's DFEH complaint was untimely with respect to certain events. *Keiffer*, 65 Cal. App. 4th at 896. The California Court of Appeal held that the defendant "waived its contention that [the plaintiff's] administrative complaint was not timely to assert claims with respect to events allegedly occurring between 1990 and 1993, because, at a minimum, [the defendant] failed to raise this issue in its opening brief on appeal." *Id.* at 900. On the other hand, "if [the defendant] had timely presented this issue, the trial court would have been required to determine whether any of [the] claims were time-barred." *Id.*

*Keiffer* is therefore inapposite for the same reasons as *Mokler*: Defendants timely raised the issue before this Court prior to trial; they did not wait until an appeal to raise it in the first instance. The Court therefore cannot find Defendants waived the issue of exhaustion.

b.    *Scope of Plaintiff's Administrative Complaints*

"The jurisdictional scope of [a] plaintiff's court action depends on the scope of the EEOC charge and investigation." *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003). "The specific claims made in district court ordinarily must be presented to the EEOC." *Id.* But "[w]hen an

14

employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Oubichon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973); *see Ong v. Cleland*, 642 F.2d 316, 318-19 (9th Cir. 1981) ("Because laypersons often initiate employment discrimination complaints and because the policies of Title VII are promoted by encouraging administrative conciliation of employment discrimination complaints, Title VII's procedural requirements are neither interpreted too technically nor applied too mechanically." (internal quotation marks omitted)). "Where claims are *not* so closely related that agency action would be redundant, the EEOC must be afforded an opportunity to consider disputes before federal suits are initiated." *Brown v. Puget Sound Elec. Apprenticeship & Training Tr.*, 732 F.2d 726, 730 (9th Cir. 1984) (emphasis in original).

While courts generally may not consider "allegations of discrimination not included in a plaintiff's EEOC charge . . . , subject matter jurisdiction extends over all allegations of discrimination that either fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (emphasis in original; internal quotation marks omitted). "In determining whether the exhaustion requirement has been satisfied, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." *Freeman*, 291 F.3d at 636 (internal quotation marks omitted).

The same standard applies to FEHA claims. "California courts . . . have endorsed the 'like or reasonably related' standard . . . , recognizing that to do otherwise would create a 'needless procedural barrier' . . . to enforcement of FEHA." *Sandhu v. Lockheed Missiles & Space Co.*, 26 Cal. App. 4th 846, 859 (1994); *see Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1082 (9th Cir. 2000) ("A[] FEHA complaint . . . may encompass any discrimination that is 'like or reasonably related to' the allegations made in the charge of discrimination. . . . includ[ing] acts of

discrimination that occur after the charge is filed.").

i.    Title VII and FEHA

Plaintiff's first claim alleges "Defendants . . . discharged JEANNINE as a result of her pregnancy" in violation of Title VII. SAC ¶ 56. Plaintiff also asserts two FEHA claims based on her allegedly wrongful termination. Her fourth claim alleges "Defendants unlawfully terminated JEANNINE on September 28, 2015. JEANNINE's pregnancy was a substantial motivating reason for her termination." *Id.* ¶ 79 (emphasis in original). Plaintiff asserts her fifth claim under California Government Code section 12940(h)[5] and alleges "Defendants made the decision to terminate JEANNINE because she complained about Defendants' discriminatory treatment of her on the basis of her pregnancy." *Id.* ¶ 85.

Plaintiff's July 27, 2015 DFEH complaint makes no mention of her termination – nor could it, given that Plaintiff was not discharged until approximately two months after she filed the charge. Instead, the DFEH complaint alleges Plaintiff was "demoted and denied reinstatement to [her] regular position due to [her] Sex-Pregnancy and taking [leave under the] FMLA." DFEH Compl. at ECF p.7. The only retaliation alleged in the DFEH complaint concerns Weddle's May 22, 2015 "negative annual review" which Plaintiff asserts was "in retaliation for taking [her] leave[.]" *Id.* Plaintiff nevertheless argues her DFEH complaint encompasses her termination claims because AmTrust's response to that DFEH complaint explains the basis for her termination. Opp'n at 17; *see* Gregory Decl., Ex. 3 at ECF p.11.

Plaintiff's Title VII and FEHA termination claims are "like or reasonably related" to her DFEH complaint to the extent she alleges her discharge was result of discrimination on account of her pregnancy or gender. These allegations do not raise a new basis for her termination claim. An investigation into Defendants' alleged gender-based discriminatory acts would have likely led to an investigation of Plaintiff's termination as well. Defendants' response to the DFEH complaint references Plaintiff's termination. Gregory Decl., Ex. 3 at ECF p.11-12. As such, the DFEH was

---

[5] California Government Code section 12940(h) prohibits "any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

United States District Court
Northern District of California

put on notice of Plaintiff's discharge and could reasonably be expected to investigate it as it related to Plaintiff's claim of gender discrimination. *See Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1082 (9th Cir. 2000) (although plaintiff's DFEH charge only addressed employer's failure to reinstate and not subsequent discharge, "the termination . . . [was] unquestionably 'like or reasonably related to' the allegations of discrimination made in [the] 1988 charge" where the refusal to reinstate led to plaintiff's termination such that the "challenge to [the] firing thus did not raise an entirely new basis for the alleged discrimination" (internal quotation marks omitted)).

However, Plaintiff's DFEH complaint did not provide the agency with notice of her claim of retaliation caused by the filing of the DFEH charge. The California Court of Appeal has held that charges of "specific instances of discrimination based on . . . race and national origin" do not encompass a "charge based on acts of retaliation by [an] employer." *Okoli v. Lockheed Tech. Operations Co.*, 36 Cal. App. 4th 1607, 1613 (1995). In *Okoli*, the plaintiff had filed a DFEH charge alleging his supervisor had denied him a promotion due to his race and national origin and had made racially derogatory comments to him. *Id.* at 1609. While the DFEH investigation was ongoing, the plaintiff's employer allegedly took numerous adverse employment actions against the plaintiff in retaliation for filing the DFEH charge. *Id.* The plaintiff did not amend his DFEH charge to include the retaliatory acts, nor did he file a new charge thereto. *Id.*; *id.* at 1613. The plaintiff received a right-to-sue letter and filed suit against his employer, alleging racial discrimination, racial harassment, and retaliation under FEHA. *Id.* at 1610.

The *Okoli* Court held that "the unlawful retaliation, which occurred *after* the filing of the DFEH charge, would not reasonably have been uncovered in an investigation of the charges that were made, i.e., why [the plaintiff] had not been promoted . . . and whether on at least two occasions, [the plaintiff's] supervisor . . . made derogatory comments about [the plaintiff's] national origin." *Id.* at 1617 (emphasis in original). As such, "[t]he DFEH was put on notice only of these specific charges" of race or national origin discrimination, not retaliation. *Id.* Because the plaintiff's "complaint added claims that were neither like nor reasonably related to his DFEH claim and were not likely to be uncovered in the course of a DFEH investigation, his retaliation claim [was] barred by the exhaustion of remedies doctrine." *Id.*

Nothing in the record shows Plaintiff amended her DFEH complaint to include charges of retaliation or filed a new complaint alleging as much. "[T]he inquiry into whether a claim has been sufficiently exhausted must focus on the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Freeman*, 291 F.3d at 637. Plaintiff's DFEH complaint makes no mention of retaliatory acts taken in response to her charge of gender discrimination. To allow Plaintiff to litigate a retaliatory discharge claim under California Government Code section 12940(h) would improperly expand the scope of her DFEH complaint and assert a new basis for discrimination which the DFEH has yet to address. *See Rodriguez*, 265 F.3d at 897 ("It would not be proper to expand the claim . . . when the difference between the charge and the complaint is a matter of adding an entirely new basis for the alleged discrimination."). Gender discrimination and retaliation for filing a DFEH complaint "involve . . . different kinds of allegedly improper conduct, and investigation into one claim would not likely lead to investigation of the other." *Id.* Plaintiff's civil allegations that Defendants retaliated against her because she complained of discrimination to the DFEH "clearly would not have been necessary to, or addressed in, the scope of an investigation into the conduct of" the demotion or failure to reinstate. *Freeman*, 291 F.3d at 637. Accordingly, Plaintiff did not exhaust her administrative remedies as to her FEHA retaliatory discharge claim.

### ii.   CFRA

Plaintiff alleges Defendants violated CFRA by not placing her "in the same or comparable position" upon her return from maternity leave and retaliated against her for taking maternity leave, including terminating her employment. SAC ¶¶ 71-72. Defendants argue Plaintiff's DFEH charge is limited to "a claim that she was retaliated against for taking leave by 'losing her book of business' – not that her leave was misclassified, that she wasn't provided notice, that anyone interfered with her leave, or that she was terminated in retaliation for taking leave." Mot. at 19.

As discussed above, an investigation regarding Plaintiff's allegations of demotion in retaliation for taking maternity leave would likely reveal her termination due to gender discrimination as well. Accordingly, the Court finds Plaintiff's DFEH complaint encompasses her CFRA claim to the extent it is premised on her alleged demotion and/or failure to reinstate and

subsequent termination in retaliation for taking maternity leave.

### 3. Summary

Based on the present record, the Court cannot find Defendants waived any challenge to Plaintiff's failure to exhaust her administrative remedies. Because Plaintiff properly exhausted her administrative remedies as to her Title VII, FEHA, and CFRA retaliation and unlawful termination claims to the extent they are based on gender discrimination, the Court DENIES the Motion for Summary Judgment as to Plaintiff's first, third, and fourth claims on this ground. However, there is no evidence that Plaintiff exhausted her unlawful termination claim to the extent it is based on retaliation for filing a DFEH charge. The Court therefore GRANTS the Motion for Summary Judgment as to Plaintiff's fifth claim.[6]

## B. Title VII and FEHA

Plaintiff's Title VII and FEHA claims only concern her termination; Plaintiff does not challenge any demotion under these statutes. *See* SAC ¶¶ 53-60, 77-82; Opp'n at 18 ("Where, as here, a case involves a claim for wrongful termination based on a retaliatory employment termination. . . .").

### 1. Legal Standards

"A prima facie case of employment discrimination may be established through direct evidence of discriminatory intent or a presumption arising from a showing of objective factors such as those outlined in *McDonnell Douglas* and its progeny." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007). Under the *McDonnell Douglas* framework, a plaintiff can establish a prima facie case of discrimination by showing

> (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff.

---

[6] Because Plaintiff did not exhaust her administrative remedies as to her FEHA retaliation claim, the Court does not consider whether Plaintiff has established a prima facie case of retaliation under FEHA.

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). This framework also applies to claims brought under FEHA. *Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007) (citing *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000)). "[U]nder the *McDonnell Douglas* framework, the requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (internal quotation marks and edits omitted).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas*, 411 U.S. at 802. If the defendant does so, "the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination." *Noyes*, 488 F.3d at 1168. "The ultimate burden of persuasion remains with the plaintiff." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

> 2.    Prima Facie Case

Plaintiff does not argue there is direct evidence of discrimination. *See* Opp'n; *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017) ("Direct evidence of discriminatory intent consists of evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption. [] Racist or sexist statements constitute such 'direct evidence' of discrimination." (internal quotation marks omitted)). Plaintiff therefore must establish a prima facie case of discrimination through the *McDonnell Douglas* framework. Plaintiff identifies an adverse employment action, her termination. *See* 42 U.S.C. § 2000e-2(a) (identifying termination as adverse action); Cal. Gov't Code § 12940(a) (same). Plaintiff also identifies her gender as a protected class. But other than this, she makes little attempt to make a prima facie case.[7] *See*

---

[7] Plaintiff ignores the prima facie analysis and argues only that she meets the burden of establishing pretext. *See* Opp'n at 18-19. This failure alone is grounds for granting the Motion for Summary Judgment: Plaintiff must establish a prima facie case before the Court can consider whether Defendants' proffered legitimate, nondiscriminatory reasons are pretext. It is not the Court's responsibility to argue Plaintiff's case for her, nor is the Court's responsibility to search the record for facts in support of her claims. *See Keenan*, 91 F.3d at 1279 ("[I]t is not our task, or

Opp'n at 18-19 (acknowledging without analyzing *McDonnell Douglas* burden-shifting test).

Plaintiff's prima facie case fails on the fourth prong.[8] Plaintiff offers no evidence that Defendants treated her differently than a similarly situated employee who does not belong to the same protected class as Plaintiff. "In order to show that the employees allegedly receiving more favorable treatment are similarly situated . . . , the individual[] seeking relief must demonstrate, at the least, that [she is] similarly situated to those employees in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (internal quotation marks omitted). Plaintiff's arguments focus on how Defendants treated her. She fails to identify evidence that Defendants treated her differently from other employees – in other words, all employees experienced broker reassignments, regardless of whether they took maternity leave.

Plaintiff declares that when she returned from maternity leave, she "was assigned to work on completely new risks for which [she] had no formal training" and "was unable to meet AMTRUST's impossibly high expectations." Clark Decl. ¶¶ 29, 40. But Plaintiff does not provide evidence that Defendants did not impose these "impossibly high expectations" on other employees as well. She also does not address the evidence that brokers were redistributed amongst all underwriters, not just her, nor does she offer evidence showing that other underwriters were assigned higher-performing brokers.

Plaintiff argues the cancellation of her training is "[a]n obvious example" of how she was treated differently. Opp'n at 14; *see* Clark Decl. ¶¶ 34-39. Without more, this is not evidence of

---

that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." (internal quotation marks omitted)); *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("[J]udges are not like pigs, hunting for truffles buried in briefs." (internal quotation marks omitted)).

[8] It also does not appear that Plaintiff can satisfy the second prong of the *McDonnell Douglas* test. She cites no evidence that she performed her job satisfactorily once she returned to work. The record shows, and Plaintiff does not dispute, that she received a "2 – needs improvement" on her 2014-2015 Performance Review, was unable to meet her budget goals, had attendance problems, received authority violations in July and August 2015, and received two complaints from her brokers. Plaintiff does not dispute she had attendance troubles, authority violations, or broker complaints. While Plaintiff declares she secured $409,028; $892,801; $1,077,215; and $1,095,570 in premiums between 2011 and 2014, she does not identify what her target goals were for those years, and she also does not declare whether she had similar attendance troubles, authority violations, or complaints prior to going on leave. Clark Decl. ¶ 8.

disparate treatment. Plaintiff does not cite to evidence that similarly situated employees received training. Nor does Plaintiff identify evidence that she and those employees were not members of the same protected class; for instance, nothing in the record suggests the employees who did receive training were male or had not taken maternity leave. As such, the cancellation of Plaintiff's training, in and of itself, does not demonstrate disparate treatment.

Plaintiff identifies only one individual, Regina Molloy, who she contends Defendants treated more favorably. Plaintiff does not explain how Molloy – another female employee – is a similarly situated employee who is not part of the same protected class as Plaintiff. On the contrary, Plaintiff provides evidence that, like Plaintiff, Molloy took maternity leave while employed by Defendants. Gregory Decl., Ex. 2 (Molloy Dep.) at 29:7-15; Clark Dep. at 62:9-11 ("Q. And do you know any other employees who took the maternity leave? A. Regina."); Weddle Decl. ¶ 3 (Molloy "took a pregnancy-related leave from August 20, 2013 to January 1, 2014 while under my supervision.").

Plaintiff offers only speculation, not evidence, of favoritism toward Molloy. *See* Clark Decl., Ex. 24. Plaintiff contends photographs of Weddle and Molloy at a baseball game provide "an obvious explanation as to why Tony Weddle showed favoritism to a far less experienced underwriter, Regina Molloy, in assigning [Plaintiff's] book of business to her." Clark Decl. ¶ 46; *but see* Clark Dep. at 119:9-10 ("I don't know the reason why [Weddle] gave [Plaintiff's accounts] to Regina."). Plaintiff does not explain what is "obvious" about these images; they show Weddle and Molloy sitting next to each other at a baseball game. *Id.*, Ex. 24. This does not demonstrate favoritism – particularly given that Plaintiff and other employees were at the game with them. *See* Clark Decl. ¶ 46 ("I know these photos are accurate because I was with them at this baseball game and observed the pictures being taken."); Molloy Dep. at 128:6-129:20 (testifying that "Jeannine took the picture and Veronica . . . was there too and Jesse" and identifying other employees in photographs). Plaintiff's insinuations do not constitute evidence that creates a triable issue of material fact. *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009) ("Summary judgment requires facts, not simply . . . rank speculation.").

Without evidence that she satisfactorily performed her job or evidence that she was treated

differently than other similarly situated employees, a reasonable jury could not find Plaintiff has established a prima facie case of discrimination under Title VII or FEHA. Accordingly, the Court GRANTS the Motion for Summary Judgment as to Plaintiff's first and fourth claims.

## C.       Failure to Prevent Discrimination or Retaliation

Plaintiff's sixth claim alleges the AmTrust Defendants failed to prevent discrimination or retaliation in violation of FEHA. SAC ¶¶ 90-96. FEHA makes it unlawful "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k). Because Plaintiff offers no evidence that Defendants discriminated or retaliated against her on account of her gender, her failure to prevent claim cannot survive summary judgment. *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998), *as modified* (May 12, 1998) ("There's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred[.]" (edits omitted)); *Mitchell-Matthews v. California*, 2015 WL 1503498, at *13 (N.D. Cal. Apr. 1, 2015) ("Because Plaintiff has not made out a prima facie case for discrimination under Title VII or FEHA, her claim for failure to prevent discrimination also fails as a matter of law."). The Court therefore GRANTS the Motion as to Plaintiff's sixth claim.

## D.       FMLA and CFRA Claims

Plaintiff's second and third claims allege violations of the FMLA and CFRA, respectively. *See* SAC ¶¶ 61-76. Both claims are based on Defendants' alleged failure to return Plaintiff to the same or comparable position upon her return from maternity leave in retaliation of taking such protected leave. *Id.* ¶¶ 63-64, 71-72.

### 1.       Legal Standards

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise" these rights. 29 U.S.C. § 2615(a)(1); *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011).

Prohibited acts under the FMLA fall into two general categories: (1) "interference" claims, and (2) "retaliation/discrimination" claims. 29 U.S.C. § 2615(a)(1) (interference); 29 U.S.C. § 2615(a)(2) (retaliation/discrimination). "By their plain meaning, the anti-retaliation or anti-discrimination provisions [of the FMLA] do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1), the provision governing 'Interference [with the] Exercise of rights.'" *Bachelder*, 259 F.3d at 1124. Accordingly, "when a plaintiff alleges retaliation for exercise of FMLA rights, that claim is properly analyzed as an interference claim under section 2615(a)(1)." *Rivera v. FedEx Corp.*, 2013 WL 6672401, at *6 (N.D. Cal. Dec. 18, 2013); *see Bachelder*, 259 F.3d at 1122-23 (using protected leave as a negative factor in employment decisions violates the FMLA because "attaching negative consequences to the exercise of protected rights surely 'tends to chill' an employee's willingness to exercise those rights").

CFRA is California's counterpart to the FMLA. *Richey v. AutoNation, Inc.*, 60 Cal. 4th 909, 919 (2015); *see* Cal. Gov't Code § 12945.2. FMLA and CFRA claims may be analyzed together, "[s]ince CFRA adopts the language of the FMLA and California state courts have held that the same standards apply." *Liu v. Amway Corp.*, 347 F.3d 1125, 1132 n.4 (9th Cir. 2003) (citing *Dudley v. Dep't of Transp.*, 90 Cal. App. 4th 255, 261 (2001)).

To establish an interference claim, a plaintiff must show by a preponderance of the evidence that (1) she took "FMLA-protected leave" and (2) it constituted "a negative factor" in an adverse employment decision. *Bachelder*, 259 F.3d at 1122, 1125. Evidence in support of the claim may be direct, circumstantial, or both. *Id.* at 1125. "In interference claims, the employer's intent is irrelevant to a determination of liability." *Sanders*, 657 F.3d at 778.

2.   <u>Analysis</u>

It is undisputed that Plaintiff requested, and Defendants granted, FMLA and CFRA leave. *See* Clark Decl. ¶ 10; Clark Dep. at 63:3-8. The only issue in dispute is whether Defendants interfered with Plaintiff's leave by requesting that she return to work prior to the expiration of her

protected leave and used Plaintiff's protected leave as factor to demote and terminate her.

a.   *Plaintiff's Return Date*

"[A]n employer has discouraged an employee from taking FMLA leave when his or her supervisor interferes with the length and dates of leave, including denying leave out right." *Liu*, 347 F.3d at 1134. Nothing in the record shows Defendants sought to cut short Plaintiff's protected leave.

On November 20, 2014, Boretti sent Plaintiff an email informing her that Weddle had attempted to contact Plaintiff but had not heard back from her and asking Plaintiff to "[p]lease let us know if you intend to return to work on Monday, December 1, 2014. Your immediate response is greatly appreciated." Clark Decl., Ex. 1 at ECF pp. 2, 4, 6, 8. Plaintiff responded on November 24, 2014 by attaching "a letter . . . from UNUM approving [her] CFRA [leave] through December 24[,] 2014." *Id.* at ECF p.2. Plaintiff emailed Weddle on November 20, 2014 stating she was unaware that he had tried to reach her, attaching the UNUM letter, and stating "[l]et me know when you are free to call to discuss my return to work." *Id.* at ECF p.3. Weddle's response, if any, is not in the record.

On December 10, 2014, Plaintiff emailed Boretti stating she would use her twelve weeks of CFRA leave through January 15, 2015. *Id.* at ECF pp. 5, 8. Boretti responded by stating "[w]e understand that letters were sent to you previously from UNUM indicating time which would be exhausted for FMLA, CFRA; including the Pregnancy Leave Disability." *Id.* at ECF p.7. Boretti further indicated "[w]e have forwarded your email to UNUM to provide their response and reasons they have provided us with the exhausted dates which I also understand you received." *Id.* Boretti did not ask that Plaintiff return to work before or on January 15, 2015. *See id.* There is no evidence of communications between Plaintiff, Boretti, or Weddle between November 24, 2014 and December 10, 2014.

Plaintiff's assertion that Weddle asked her "on multiple occasions to return to work before the end of [her] permitted maternity leave" (Clark Decl. ¶ 12) is unsupported by any documentary evidence. *See also id.* ¶ 20 ("[D]uring my maternity leave, Tony Weddle was pestering me to

return back to work early.").[9]  In fact, Plaintiff's testimony shows Weddle never tried to force her to return to work before the end of her protected leave:

> Q.    What would [Weddle] tell you during these telephone conversations?
> A.    Asking me when I was planning to come back.
> Q.    All right.  Did you tell him that you were coming back in January of 2015?
> A.    Eventually, yes, I did.
> Q.    Did he ask you to come back sooner?
> A.    Yes.
> Q.    What did he say?
> A.    When I was planning to come back.
> Q.    But did he say I want you to come back sooner than January 2015?
> A.    I didn't let them know my return date because I was uncertain.
> Q.    But he just said to you when are you coming back?
> A.    Mm-hmm.
> Q.    And you interpreted that to mean he was harassing you in terms of coming back earlier from your leave?
> A.    I told him that I wasn't sure, that I was still recuperating.
> Q.    And what was his response to that?
> A.    I don't recall.
> Q.    Okay.  Did he seem angry with that?
> A.    A little bothered, but he didn't say any particular words.

Clark Dep. at 77:2-78:3.  Plaintiff's testimony thus shows Weddle only sought to determine *when* Plaintiff intended to return to work, not that he attempted to force her to return on a specific date, let alone earlier than expected.  Plaintiff offers no evidence that Weddle was "bothered" by her maternity leave, rather than by Plaintiff's equivocation regarding her return-to-work date.  Plaintiff's interference claim is further undermined by the fact that Plaintiff "delayed [her] return to work to January 20 at the specific request of Tony Weddle."  Clark Decl. ¶ 21.  This record does not permit a reasonable fact finder to conclude Weddle required or pressured Plaintiff to end her maternity leave early.

Viewed in the light most favorable to Plaintiff, Boretti's emails also do not allow a reasonable jury to find Defendants interfered or sought to interfere with the length of Plaintiff's

---

[9] Any such interference would have taken place only after November 20, 2014, as Plaintiff was unaware that Weddle attempted to contact her until that date.  *See* Clark Decl., Ex. 1 at ECF p.2 (stating on November 24, 2014 "I was unaware Tony was trying to reach me" in response to Boretti's November 20, 2014 email that "Weddle . . . has tried reaching out to you . . . but has not heard back regarding your plans to return to work").

maternity leave. The fact that Boretti asked Plaintiff whether she would return to work on December 1, 2014 does not constitute interference. The record shows Boretti only sought to confirm when Plaintiff would return to work in light of the information from UNUM that Plaintiff had exhausted her FMLA leave and that her CFRA leave would expire November 30, 2014. Clark Decl., Ex. 1 at ECF pp. 2, 4, 6, 8. As noted, Plaintiff testified that she was not sure when she would return; based on the present the record, it appears she did not inform Defendants of her return-to-work date until December 10, 2014.[10] *See id.* at 5, 8.

In sum, the record does not show Defendants required Plaintiff to return to work on December 1, 2014 or before January 15, 2015; nor is there evidence that they attempted to cancel her leave. The record merely shows Defendants sought to know when Plaintiff intended to resume working. This did not interfere with Plaintiff's exercise of her FMLA or CFRA rights. *See Neumeyer v. Wawanesa Gen. Ins. Co.*, 2015 WL 1924981, at *19 (S.D. Cal. Apr. 24, 2015) ("There is no right in the FMLA to be left alone or to be completely relieved from responding to an employer's discrete inquiries." (internal quotation marks and edits omitted) (citing *O'Donnell v. Passport Health Comm'ns, Inc.*, 561 F. App'x 212, 218 (3d Cir. 2014); *Sabourin v. Univ. of Utah*, 676 F.3d 950, 961 (10th Cir. 2012); *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009))); *Dayton v. Sears Roebuck & Co.*, 2015 WL 224775, at *11 (E.D. Cal. Jan. 15, 2015) (finding no CFRA violation where "[t]here is no evidence that [d]efendants attempted to cancel [p]laintiff's leave or deny any requests for extension of time" or that plaintiff's manager "ever tried to force Plaintiff to return, or that she took any action to compel Plaintiff's return").

There also is no evidence that Defendants' communications with Plaintiff were harassing. *See* Clark Decl. ¶ 12 ("This harassment was a source of great anxiety to me. . . ."). There is nothing in the record to support Plaintiff's contention that Weddle inquired "on multiple occasions" about her return. Plaintiff does not provide any details about such inquiries, her November 24, 2014 emails establishes she had not heard anything from Weddle before that date,

_____

[10] Plaintiff argues "Defendants claim they contacted Jeannine during her leave 'to seek clarity on her return date'; yet no evidence has been submitted on this point." Opp'n at 21-22. Plaintiff submits emails that prove this point. *See* Clark Decl., Ex. 1. Plaintiff's testimony also supports Defendants' assertion. *See* Clark Dep. at 76:12-78:3.

and she testified that she could not remember how many conversations she had with Weddle. Clark Dep. at 76:16-20. Plaintiff provides evidence of only two emails from Boretti dated November 20, 2014 and December 10, 2014 – the latter of which Boretti sent in response to an email from Plaintiff.

Accordingly, there is no evidence to permit a reasonable finder of fact to conclude Defendants demanded Plaintiff end her maternity leave early.

        b.    *Failure to Restore*

"[A]n employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave." *Liu*, 347 F.3d at 1132 (citing 29 U.S.C. § 2614(a)). Employees who take protected leave under CFRA are also entitled to be restored "in the same or a comparable position upon the termination of the leave." Cal. Gov't Code § 12945.2(a). Under both statutes, whether an employee has been reinstated to the same or equivalent position depends on the duties, pay, and benefits of the position. 29 C.F.R. § 825.215(a) (under FMLA, "an equivalent position" is "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status" and "must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority"); Cal. Gov't Code § 12945.2(c)(4) (under CFRA, "the same or a comparable position" is one "that has the same or similar duties and pay that can be performed at the same or similar geographic location as the position held prior to the leave"). "[E]vidence that an employer failed to reinstate an employee who was out on FMLA leave to her original (or an equivalent) position establishes a prima facie denial of the employee's FMLA rights." *Sanders*, 657 F.3d at 778.

The right to reinstatement is not without limits. *Id.*; *Richey*, 60 Cal. 4th at 919; *see* 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."). For instance, an employee on protected leave has no "greater right . . . to avoid a company-wide

1    work force reduction than she would have possessed had she not taken the leave." *Tomlinson v.*

2    *Qualcomm, Inc.*, 97 Cal. App. 4th 934, 940 (2002).  In the Ninth Circuit, "the burden is on the

3    employer to show that he had a legitimate reason to deny an employee reinstatement." *Sanders*,

4    657 F.3d at 780.

5            As evidence that her FMLA/CFRA leave served as a negative factor in Defendants'

6    decision to demote her, Plaintiff cites her January 20 conversation with Weddle, where Weddle

7    told her that (1) the position she held prior to her maternity leave was no longer available to her,

8    (2) her entire book of business had been permanently reassigned to Regina Molloy, (3) Weddle

9    created a "new position" for Plaintiff because he did not think she would return to AmTrust after

10   her maternity leave, (4) Plaintiff would perform administrative duties until he created this new

11   position, (5) Plaintiff would be assigned three online clients "with the expectation that [she] would

12   secure high quotas," and (6) Plaintiff's book of business and previous position and book of

13   business would have been available to her had she returned to work prior to the end of her

14   scheduled maternity leave.  Opp'n at 21; Clark Decl. ¶ 15.

15           The Court finds Plaintiff does not create a triable issue that Defendants failed to restore her

16   to her position.  Plaintiff fails to show that her post-maternity work, including her temporary

17   administrative assignments, constituted a demotion; that Defendants assigned her low-performing

18   brokers and set unreasonably high expectations; or that Plaintiff's maternity leave negatively

19   affected the reassignment of brokers or any aspect of her employment.

20                          i.      Pre- versus Post-Maternity Leave Assignments

21           Plaintiff offers few facts as to what her pre-maternity work entailed.  Without such context,

22   a reasonable jury cannot meaningfully compare Plaintiff's responsibilities pre- and post-maternity

23   leave, much less conclude Plaintiff's responsibilities upon her return were any different.  The only

24   evidence Plaintiff identifies regarding her pre- and post-maternity leave work is that she had a

25   different book of business.  Prior to taking maternity leave, Plaintiff worked with clients in the

26   construction industry; when she returned, she had to develop a book of business in industries

27   including manufacturing, wholesale, distribution, restaurants, hotels, and liquor liability.  Clark

28   Dep. at 152:20-153:1; Clark Decl. ¶¶ 6, 22.

There is no evidence that this, in and of itself, is a demotion. There are no facts showing how Plaintiff's responsibilities or duties changed because she worked with clients in different industries. A January 30, 2015 memorandum shows Plaintiff was "responsible for the oversight, management and underwriting integrity of all General Binding Authority (GBA) contracts and Online system brokers [she was] assigned." Clark Decl., Ex. 3 at 2. These responsibilities included broker identification, marketing, system training, underwriting training, audit/oversight, premium goals, and loss ratio control. *Id.* Plaintiff does not dispute this was not in fact the case, and, as noted, there are no facts showing how these responsibilities differed from those Plaintiff had before taking maternity leave. Plaintiff also does not explain how an expectation that she would secure high quotas from her clients suggests she was given fewer responsibilities.

Plaintiff's arguments regarding her demotion are unpersuasive. Plaintiff contends that after her maternity leave, she was given "less responsibility, a completely different book of business, and less possibility for future growth and merit-based bonuses." Opp'n at 21-22; Clark Decl. ¶ 16. But Plaintiff testified she was an Underwriter in the Select Business Department both before and after taking maternity leave. Clark Dep. at 93:18-94:1; *see id.* at 97:14-18 (Plaintiff's testimony that she had "no reason to doubt that [she] continued to be assigned to the Select Business Department" upon her return as "[t]hat was the only department [she] would be qualified for"); Clark Decl. ¶ 6 & Ex. 9 (Jan. 30, 2015 Return to Work memorandum listing Plaintiff's job title as Underwriter in the Select Business Department and stating her salary remained "unchanged"). Plaintiff's work schedule did not change. Clark Dep. at 97:23-24. Although Weddle lowered her goals with regard to her premium quotes, Plaintiff testified that this did not affect her compensation. *Id.* at 93:24-94:1, 95:7-13; *see id.* at 60:1-3 (testifying her rate of pay never decreased while employed at AmTrust); *id.* at 46:8-9, 95:3-6 (testifying her compensation was not commission-based). Weddle was Plaintiff's supervisor throughout her time at AmTrust and E&S Insurance, from May 2010 until her termination. *Id.* at 33:11-17, 34:4-7. There is also no evidence Plaintiff was transferred to a different office.

While Plaintiff contends she performed administrative duties when she returned, she again does not provide evidence showing how these duties differed from those she had prior to her

maternity leave or resulted in a decrease in pay. Plaintiff also testified that she understood this was a temporary assignment; indeed, Plaintiff testified she returned to underwriting approximately two weeks after her return. Clark Dep. at 132:6-133:1. Moreover, it appears at least some of this time was used to train Plaintiff on AmTrust's new online system, which had been deployed during Plaintiff's leave and which Plaintiff had not previously used. *Id.* at 132:18-133:1.

To the extent Plaintiff argues the reassignments placed her in a position for which she was not adequately trained, the record shows Plaintiff received training and assistance to help her perform her job. Because Plaintiff was unfamiliar with her "new classes of business," Plaintiff would "discuss each case individually, or . . . would review everything, give [her] input, break it down, and then send the referral worksheet off to Tony [Weddle] to review and further discuss." *Id.* at 172:8-11. Plaintiff and Weddle "would go over a case by case as they were sent in." *Id.* at 153:4-9. They also had weekly conference calls to address Plaintiff's "questions pertaining to risks." *Id.* at 165:19-166:5. Because she "didn't understand the risks [she] was working on," Plaintiff emailed Weddle with questions about risks and understood that Weddle was trying to help her. *Id.* at 166:7-16. As noted, Plaintiff also received training with the online system. *Id.* at 132:18-133:1. Thus, Plaintiff was given a reasonable opportunity to receive the training necessary to perform her job when she returned to work. *See* 29 C.F.R. § 825.215(b).

Even assuming, arguendo, the reassignment of brokers constituted a demotion, the record shows, and Plaintiff does not dispute, that reassignments occurred across the board prior to Plaintiff's return from maternity leave. *See* Weddle Decl. ¶ 4 ("AmTrust kept track of each of the changes in broker assignments which confirmed every Underwriter was affected by the reassignments. Of my three assigned brokers in 2014, two were reassigned to others (including Molloy). Of Molloy's three assigned brokers, one was reassigned to Weddle and one reassigned to Plaintiff. Of Underwriter Amy Johnson's 12 assigned brokers, six were reassigned (one to Plaintiff) and four were cancelled completely. Finally, of Underwriter Brandi Senn's 14 brokers, six were reassigned (one to Plaintiff), and five were cancelled."). David Lewis, President and Chief Underwriting Officer of AmTrust E&S, explains that "[i]n late 2014, I directed management to reallocate employee resources across broker assignments to tackle growth opportunities and

bring the division close to the 2015 business plan.  I made this request because . . . AmTrust E&S was missing opportunities and premium production failed to meet expectations."  Lewis Decl. ¶ 6. This reallocation sought "to reduce and redistribute broker assignments across the group to provide Underwriters with more time to develop relationships and cultivate business."  *Id.*  As a result, "[b]roker changes occurred across the Company and impacted all Underwriters at AmTrust E&S."  *Id.* ¶ 7.  Nothing in the record suggests this was not true.  The FMLA only entitles employees to those "any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).  The record shows the reassignments took place while Plaintiff was on maternity leave and affected all Underwriters; there are no facts to suggest Plaintiff's book of business would not have been reassigned had she not taken protected leave.

ii.      Reassignment of Brokers and Expectations

Even if Plaintiff was reassigned the "three of the most underperforming accounts" (Clark Decl. ¶ 18), Weddle adjusted Plaintiff's target goals accordingly: Plaintiff's 2015 target goal was $750,000, whereas other Underwriters' target goals were as high as $1,550,000.[11]  Weddle Decl. ¶ 5.  Plaintiff does not offer evidence to the contrary.  Defendants provide evidence that underwriters who worked with the same underperforming brokers Plaintiff complained of after Plaintiff's termination "were successful with these brokers and produced numbers far in excess of Jeannine's production goals set by Tony Weddle[.]"  Suppl. Lewis Decl. ¶ 3.  For instance, in 2015, Plaintiff "produced numbers" of $14,700; $69,473; and $19,662 for each of her three brokers.  *Id.* ¶ 4.  In 2016, other underwriters "produced numbers" of $308,497; $995,922; and $774,592, respectively, for those same brokers.  *Id.* ¶ 3.  In 2017, underwriters "produced numbers" of $239,827; $835,298; and $790,095, respectively.  *Id.*[12]  Plaintiff offers no evidence to

---

[11] Plaintiff points out her Final Written Warning lists her target goal as $800,000 and not $750,000 as Weddle declares.  Opp'n at 4.  This difference is immaterial, as $800,000 is still lower than other Underwriters' goals, and Plaintiff did not meet a target of $750,000, let alone $800,000.

[12] While Plaintiff's figures represent only eight months of work, rather than a full year, nothing in the record suggests that Plaintiff would have produced comparable numbers if she had had an additional four months of work.

United States District Court
Northern District of California

support her assertion that Defendants "set [her up] for failure beginning the moment she returned from maternity leave" (Clark Decl. ¶ 28) and that "[t]he goals that [she] was given were unreachable by the brokers [she] was assigned" (Clark Dep. at 111:13-14). On the contrary, the 2016 and 2017 figures show that Defendants' (lowered) expectations were attainable.

There is also no evidence showing how the reassignment affected Plaintiff's bonuses. As an initial matter, there are no facts showing how bonuses are awarded. At most, the record shows they are "discretionary" (Clark Dep. 108:20-23), but there are no facts indicating what supervisors took into account when determining the amount of an employee's bonus. In any event, Plaintiff testified that in 2015, Weddle informed her that she because she was out "for so long on maternity leave" she was only entitled to 50 percent of her bonus. Clark Dep. at 60:8-10; *see also id.* at 94:8-12 (testifying bonus received in 2015 was for work performed in 2014). It is undisputed that Plaintiff went on maternity leave on June 23, 2014; as such, Plaintiff did not work for nearly six months. Plaintiff nevertheless describes the reduced bonus as "unfair" "[b]ecause [she] wrote more premiums than others." *Id.* at 60:11-12; *id.* at 60:22-61:2. But Plaintiff offers no evidence to support this assertion: there is no evidence comparing the amount of premiums Plaintiff wrote in 2014 to that of her co-workers in the same year, nor is there evidence showing Plaintiff performed one year's worth of work in six months. This reduced bonus relates to Plaintiff's work before she took maternity leave – in other words, while she was still working with brokers in the construction industry. Plaintiff therefore cannot attribute this particular bonus reduction to the reassignment.

iii.     Whether Plaintiff Would Return to Work

Finally, as to Plaintiff's assertion that Weddle stated that he was not sure if she would return to work, a reasonable jury could find that statement was due to Plaintiff's reluctance to provide him with a firm return-to-work date. *See* Clark Dep. at 77:12-15 ("I didn't let them know my return date because I was uncertain."). Plaintiff offers no evidence to suggest Weddle's statement was due to anything else.

iv.     Summary

Based on the foregoing, there is no evidence in the record to allow a reasonable jury to

conclude Plaintiff suffered a demotion.

c.    *Termination*

As with her failure to restore claim, Plaintiff contends her January 20 conversation with Weddle shows her maternity leave was a negative factor in Defendants' decision to terminate her. Opp'n at 21-22.  For the reasons set forth above, it does not.

Nor does the timing of Plaintiff's termination suggest her protected leave influenced her termination.  "[P]roximity in time between the leave and . . . termination . . . provides supporting evidence of a connection between the two events." *Liu*, 347 F.3d at 1137.  Plaintiff was terminated in September 2015, approximately eight months after she returned from leave.  This is insufficient to create a temporal nexus between Plaintiff's leave and her termination.  *See, e.g.*, *Swan v. Bank of Am.*, 360 F. App'x 903, 906 (9th Cir. 2009) (Defendant "terminated [the plaintiff] four months after her return from [FMLA] leave, which is too remote in time to support a finding of causation premised solely on temporal proximity."); *Moore v. Cent. Gaming Mgmt., Inc.*, 2014 WL 2511742, at *10 (Cal. Ct. App. June 4, 2014) (that eight months passed between plaintiff's request for CFRA leave and decision to terminate her precluded finding that causal connection existed between the two events); *Kadiyan v. Medtronic*, 2011 WL 13142145, at *24 (C.D. Cal. Apr. 8, 2011), *aff'd sub nom. Kadiyan v. Medtronic, Inc.*, 510 F. App'x 649 (9th Cir. 2013) ("The fact that plaintiff was allegedly terminated eight months after beginning intermittent CFRA leave, and five months after beginning full-time CFRA leave, without more, . . . is not sufficient to raise triable issues of fact regarding retaliation for the exercise of rights under the CFRA.").

On the other hand, there is ample evidence of Plaintiff's performance problems prior to her termination.  Plaintiff testified that she failed to meet her production goals for three months in a row.  Clark Dep. at 164:18-21.  By September 3, 2015, Plaintiff had met only 30% of her annual budget goals.  Weddle Decl., Ex. E.  Plaintiff also had two authority violations and received two requests from her brokers that they be reassigned to a different Underwriter.  *Id.*; *id.*, Ex. F.  These are not subjective elements that warrant "careful analysis of possible impermissible motivations." *Liu*, 347 F.3d at 1136.  Rather, these are objective factors that show Plaintiff was terminated due to her inability to meet Defendants' performance standards.

3. <u>Summary</u>

There is no evidence that would allow a reasonable jury to find Defendants interfered with Plaintiff's protected FMLA or CFRA leave. Accordingly, the Court GRANTS the Motion for Summary Judgment as to Plaintiff's second and third claims.

**E.      Wrongful Termination in Violation of Public Policy**

Plaintiff's seventh claim alleges Defendants terminated her in violation of public policy by terminating her based on her gender and/or because she took protected leave. SAC ¶¶ 96-102. "The central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 702 (2009), *as modified* (Feb. 10, 2010).

As discussed above, nothing in the record permits a reasonable jury to find Plaintiff was terminated on account of her gender or because she took protected leave. It therefore follows that a reasonable jury could not find Defendants violated a public policy in terminating Plaintiff. The Court therefore GRANTS the Motion as to Plaintiff's seventh claim.

**CONCLUSION**

Based on the analysis above, the Court **GRANTS** the Motion for Summary Judgment. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter a separate judgment.

**IT IS SO ORDERED.**


Dated: February 13, 2018

_____
MARIA-ELENA JAMES
United States Magistrate Judge